N THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

MARTIN A. BOYD,

        Plaintiff,

v.

AIRCRAFT POWER AND SERVICES, INC., aka APS INC., and COMMERCIAL AIRCRAFT EQUIPMENT INC.,

        Defendant.

Case No. CIV-04-438-SH

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, Martin Boyd, was a long time employee of ATI Sales & Services, Inc. (ATI), a company that rebuilt/reconfigured airplane parts, located in Durant, Oklahoma. During the time Martin Boyd was employed at ATI, two additional companies were owned and operated by the same ownership group, Aircraft Power & Services, Inc. (APS) and Commercial Aircraft Equipment, Inc. (CAE), the named-defendants herein. The three companies shared payroll and employees, management, common ownership, and similar operational functions and were essentially operated as one organization.

On March 2, 2004 Martin Boyd was informed by management that due to a reorganization of ATI and APS, his position, Vice President of Engineering, was being eliminated. According to the APS General Manager, effective March 3, 2004, Martin Boyd would become a "consultant" and was to report directly to his replacement, John Kasavich, for daily assignments. On March 4, 2004, Rich Ribich provided Mr. Boyd a second letter, at Mr. Boyd's request, informing Mr. Boyd that his last day would be May 7, 2004.

Mr. Boyd alleges his termination was in violation of the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Oklahoma Anti-Discrimination Act, and Oklahoma public policy. Mr. Boyd also alleges the Defendants' conduct caused him severe emotional distress.

This is the unusual case in which the parties cannot even agree on even a basic set of facts. For example, the parties cannot even agree as to which corporate entity was Martin Boyd's employer was at the time of his termination. Plaintiff and Defendants cannot agree on whether Plaintiff was involuntarily terminated or whether he resigned.

**Proposition One: APS and CAE are alter egos of a corporation called ATI Sale and Services, Inc. and as such even if, technically, ATI was Plaintiff's employer, APS and CAE are liable for the unlawful discrimination against Martin Boyd.**

In the early 90s, ATI was technically owned by two sisters, Brandi McCarty and Angela Roberts (McMurray). While the sisters were the record owners, in reality, the business was run by their father, Doug Hyde. He was always at the facility in Durant, Oklahoma and the two managing employees, Martin Boyd and Dale Owens, reported directly to Mr. Hyde who made the operational decisions for the company (Dale Owens is Doug Hyde's half-brother). ATI operated out of a building owned by AreoTech International ("International"), another company owned and operated by Doug Hyde. In 2000, Doug Hyde went to federal prison after a conviction for fraud. While Mr. Hyde was in prison, Mr. Owens and Mr. Boyd ran the day to day business of ATI.

There were two other companies, Aircraft Power Services, Inc. (APS) and Commercial Aircraft Equipment, Inc. (CAE), the two named Defendants in this case. Both were owned by either Mr. Hyde or his daughters. APS operated in the same

building as ATI and International. CAE operated out of another building only 30 minutes away.

While Mr. Hyde was in prison, Dale Owens and Martin Boyd ran the operations at the ATI/APS building. After 9-11, the airline industry took a hard hit and business at ATI and APS took a down turn. ATI filed for bankruptcy but continued to operate. In 2003, after serving his prison term and returning to work, Doug Hyde approached Cindy Brown about investing and buying most of the ownership interest of CAE (only tow minority share owners other than Doug Hyde or his daughters). Ms. Brown did so.

Even though Doug Hyde was not the owner of ATI (his daughters owned the stock of the bankrupt company) and the bank owned the leveraged assets (equipment, licenses, etc.), Doug Hyde also approached Cindy Brown about buying both ATI and APS. Ms. Brown began looking at the companies and ultimately purchased them both from Doug Hyde and his daughters. As of March of 2004, Ms. Hyde was the record owner of ATI, APS and all but a small sliver of CAE.

Upon the sale of ATI, Ms. Brown assumed the assets and liabilities of all theAIT and consolidated its assets into APS, which she now also owned. With the purchase of both CAE and APS, there was also an "under the table agreement." Even though Doug Hyde was not an owner of either company, he was promised by Cindy Brown that if she ever sold either APS or CAE for a profit, 50% of the sale proceeds would belong to Doug Hyde. There was no consideration for this promise and it was not written down.

Just this January, some two years after Cindy Brown brought APS from Doug Hyde's daughters, she and Mr. Hyde entered into a written contract of sorts acknowledging in writing that Mr. Hyde was entitled to 50% of the sale of APS. The

3

"under the table agreement" between Mr. Hyde and Ms. Brown regarding CAE has never been written down.

Ms. Brown bought CAE in mid-2003 and the closing of her purchase of both APS and ATI did not occur until March of 2004. However, during that time frame, Doug Hyde continued to run the business he did not own. He made hiring decisions and all operational decisions. He showed up to work virtually every day at the ATI/APS facility.

Martin Boyd continued to report to Doug Hyde. In January of 2004, Martin Boyd's paychecks began coming from CAE instead of ATI. Everyone at the facility was told the companies were consolidating. Doug Hyde and Cindy Brown made the decision to hire a general manager for APS and CAE; they hired Rick Ribich. Mr. Ribich came on board in early 2004 as an employee of APS and/or CAE, even he cannot say which company he worked for. He was paid by CAE only. Even though he was told he was hired to run only APS and CAE (not ATI), as far as he was concerned anyone who worked at the ATI/APS facility worked for him, including Martin Boyd. The companies used each other's employees as they saw fit. Even when Ms. Brown responded to Martin Boyd's unemployment claim, she responded on behalf of APS, not ATI.

As such, the reality of the companies' operations is that they all three functioned as one company, both before Cindy Brown took formal ownership of all three companies and certainly so by mid-March of 2004 when the sales transactions were actually inked. Legally and factually, the companies are alter egos of one another and "joint employers" of Martin Boyd. *See, e.g., Sizova v. Nat'l Institute of Stds. & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002). There is no question that APS and CAE are both liable for the unlawful and discriminatory termination of Martin Boyd.

**Proposition Two: Plaintiff is not an independent contractor, but is an employee.**

Continuing to insist there is a meaningful distinction between ATI and APS, Defendants also maintain Martin Boyd was only an employee of ATI until March 3, 2004 and thereafter Martin Boyd voluntarily agreed to become an "independent contractor" for APS for the next two months before his "retirement."

This assertion is completely belied by reality. In the last two months of Martin Boyd's work for Defendants, his job did not change one iota from the job he had performed for ATI over the past decade. The determination of whether one is an employee of an independent contractor is not based on labels alone, but instead on the substance, economic realities and actual functions of one's job. The factors for consideration are well known and laid out in both Oklahoma and federal case law. *See, e.g., Bartels v. City of Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947); *Mistletoe Express Service v. Culp*, 353 P.2d 9, 12 (Okla. 1960).

Generally, an independent contractor is defined as one who engages to perform a certain service for another, according to his own method and manner, <u>free from control and direction of his employer</u> in all matters connected with the performance of the services. Martin Boyd was never an independent contractor.

There was no contractual agreement between Martin Boyd, ATI, APS or CAE (hereafter collectively Defendants). Mr. Boyd always reported to a boss, Doug Hyde or Rick Ribich, and during the time Defendants insist Martin Boyd was an independent contractor, he also reported to one of his alleged replacements. Martin Boyd has set work hours; he could not come and go as he pleased and was expected to show up for work

every day. He was paid a salary; not on a per task basis. He was paid regardless of how many particular tasks he complete, regardless of the Defendants' profits or losses (in which Mr. Boyd took no part) and without regard to his successful completion of any tasks. The day to day operational tasks of his job did not change. He continued to receive vacation and sick leave (the same salary and leave he'd received even when he was, admitted by Defendants, an employee). None of the tools or equipment needed to perform his job were provided by Martin Boyd. In short, there is absolutely no legitimate claim that Martin Boyd was anything but an employee for purposes of liability under the ADA and OADC.

With regard to these preliminary issues, disputed and/or agreed jury instructions are being submitted on the issue of joint employer, alter ego and the employee versus independent contractor dispute. However, Plaintiff anticipates a directed verdict in these subjects and that no instruction to the jury on the particular factors will be necessary, save an instruction that ATI, APS and CAE were joint employers and/or alter egos and that Martin Boyd was indeed an employee of the entities.

**Proposition Three: Plaintiff was discriminated against because of a perceived disability, his age, and a public policy tort and now seeks punitive damages.**

Plaintiff was terminated in part due to his age, and because Defendants regarded Plaintiff as disabled, due to a heart condition and resulting quintuple bypass procedure. Plaintiff will have no trouble meeting his prima facie cases under the ADEA and the ADA. What's more, the Oklahoma Supreme Court recently clarified the common law Burk Tort remedy is available to plaintiff's who have experienced age discrimination.

*Saint v. Data Exchange Inc.*, 2006 OK 59, 2006. The same analogy applies to Oklahoma's public policy against disability discrimination.

The evidence at trial will also demonstrate Defendants' defense of an announced intent by Martin Boyd to retire is a sham. Defendants have offered several justifications for terminating Martin Boyd, none of which are legitimate. In short, the evidence at trial will demonstrate the Defendants are not merely mistaken about the facts surround Martin Boyd's separation from employment; instead, Defendants are not being truthful.

Given the fact Plaintiff faced multiple types of discrimination resulting in a loss of employment his damages are substantial. The state tort claims are not subject to federal limitations on damages. Punitive damages are being sought, and given the disingenuous defenses asserted by Defendants, are likely to awarded.

**Proposition Four: Some of Defendants' Exhibits are Inadmissible or should be excluded for failure to timely identify and produce same.**

Defendants have identified large groups of document as single exhibits and it is therefore difficult to ascertain just what documents are intended to be introduced into evidence. For example, Defendants' exhibit number 1 (attached hereto) is a large group of documents from the EEOC file related to Plaintiff's charge of discrimination. The entire file is irrelevant to this case. (Even the charge of discrimination is of virtually no relevance: there is no dispute regarding whether the charge was timely or whether Martin Boyd has exhausted his administrative remedies).

Within the documents collectively designated as Plaintiff's Exhibit 1, there is certainly one document, bates number P 0152 is inadmissible because it is irrelevant, overly prejudicial and hearsay. The document, attached hereto as " P 0152" is a form "Decision Not to file or to Drop Issues."

7

The document was signed by Martin Boyd on May 20, 2004 (a mere two weeks after his termination became effective). The document relates Martin Boyd was "advised by the EEOC Representative that [his] information does not support an allegation of discrimination in violation of the laws administered by the EEOC."

Defendants apparently intend to offer this exhibits as evidence that (1) the EEOC actually determined Martin Boyd was not discriminated against and or (2) Martin Boyd was so informed of that decision. However, that is simply not so and, in any event is overly prejudicial.

Martin Boyd went to the EEOC immediately after his termination. And, as this document demonstrates, was told not to file a charge. However, this document does not reflect any finding whatsoever by the EEOC after an investigation; instead, the EEOC employee for whatever reason declined to investigate any allegations. After this, Martin Boyd sought out and retained an attorney. He filed a formal charge of discrimination on July 7 and thereafter brought this suit. Even after Mr. Boyd filed his formal charge, the remainder of the EEOC file makes clear that no investigation into any factual allegations was conducted at any time.

All of Plaintiff's Exhibit 1 is inadmissible because it is irrelevant and prejudicial. Furthermore, the particular document identified as within Defendants' Exhibit 1 at P 0152, no relevance whatsoever, is overly prejudicial an inadmissible hearsay, as it purports to convey as a fact that the EEOC determined the Defendants did not violate discrimination laws. It is inadmissible under FED. R. EVID. 401, 402, 403 and 801 and 802.

Next, many of Defendants' exhibits have been produced and identified out of time. Plaintiff submitted discovery requests in the spring of 2005 and again in 2006. The discovery requests in 2005 were responded to, but counsel for Plaintiff now knows not all responsive documents were produced in 2005. The 2006 discovery requests were timely submitted to counsel for Defendants and Defendants' responses were due June 15, 2006.

Discovery closed on June 30, 2006 (after being extended as a result of Defendants' requests to extend the dispositive motion deadline). July 10, the parties were to exchange marked trial exhibits. As of July 10, no documents responsive to Plaintiff's 2006 discovery requests, seeking financial documents, had been received.

*Partial responses* to the 2006 discovery requests were received on <u>July 17 and today, July 21</u>. What's more, while identifying exhibits in this case, on July 11, 2006, Defendants identified and produced for the first time a few documents that should have been produced back in 2005, in response to Plaintiff's original discovery requests. (Again, to date, only partial responses have been received and for this reason, Plaintiff continues to reserve and request the Court's permission to identify exhibits out of time depending on the additional production by Defendants).

Defendants have not complied with Rule 26 and Rule 34 discovery requirements, or with this Court's scheduling order. Even with due consideration for Defendants' current counsel who only entered an appearance in this case in May of this year, there is absolutely no justification for Defendants' attempts to produce new documents and offer them as exhibits *after the discovery deadline and even after the deadline to mark and identify trial exhibits.*

Plaintiff's proposed exhibit number 19, APS 000126, is one such document. This document should have been produced in response to discovery requests back in 2005. Instead, it was identified and provided to counsel for the first time on July 11, 2006; again, this was after the close of discovery and after the deadline to identify and exchange trial exhibits.

What's more, Defendants' exhibit 19 is incomplete (redacted) and hearsay. Apparently, it will be offered to prove the health insurance costs to the company were the same regardless of who was insured on the company's group health plan. As such, the document is also inadmissible hearsay.

Defendants' exhibit 19 was produced and identified late, and it contains inadmissible hearsay. It should not be excluded for failure to comply with Fed. R. Civ. P. 26 and and 34 and pursuant to Fed. R. Evid. 801 and 802.

**Proposition Five: Defendants' proposed jury instructions are too long and too conversational. The model jury instructions proposed by Plaintiff are more appropriate.**

The parties have agreed on some jury instructions and those have been submitted as agreed. The disputed jury instructions relate mostly to a difference of opinion regarding the proper manner in which to instruct the jury, rather than on meaningful differences regarding the applicable law.

Plaintiff has almost exclusively submitted model Federal Jury Practice Instructions and Oklahoma Uniform Jury Instruction. Defendants proposed instructions are similar but have a more verbose, conversational tone, with introductory comments leading into the otherwise model instructions.

Jury deliberations are perhaps the most important aspect of a trial. Juries need concise issue specific instructions to guide them step-by-step in their deliberations. The instructions proposed by Defendants are too conversational, contain commentary and lead ins that are inappropriate and combine too many issues into single instructions.

For example only, Defendants have offered a single instruction, Plaintiff's Requested Instruction No. 12, related to Plaintiff's ADA claim. This proposed instruction is over 7 narrative pages long and addresses subjects not at issue in this case (like "otherwise qualified") under the ADA. This instruction will only lead to confusion and frustration on the jury's part. Plaintiff's offered ADA instructions, numbers 19-27 in Plaintiff's disputed submission, are more concise, simpler and issue specific. Plaintiff respectfully submits it is more appropriate to instruct the jury as outlined in Plaintiff's disputed submissions as compared to Defendants. Plaintiff respectfully submits the same considerations apply to the introductory instructions regarding the jury's duty, deliberations, witness instructions, evidence instructions and the like. For this reason, Plaintiff has submitted separate disputed instructions on these subjects as well.

## CONCLUSION

This is a fairly typical age and disability discrimination case, with accompanying state law claims based on the same set of factual allegations. The state claims are not duplicative, however, because damages are not limited under the state claims.

The parties do not agree on even preliminary facts like whether Martin Boyd was in employee or an independent contractor and what entity Mr. Boyd worked for. Before this case goes to the jury, Plaintiff expects the Court to have determined as a matter of law that Martin Boyd was an employee and that the Defendants APS and CAE are joint

employers and/or alter egos of one another and of ATI (the entity Defendants insist employed Mr. Boyd exclusively). Plaintiff also expects the remaining evidentiary and instruction issues set forth above may likewise be resolved without significant dispute.

Respectfully submitted,

*/s/ Kathy D. Terry*

Jim T. Priest, OBA # 7310
Kathryn D. Terry, OBA # 17151
Whitten Nelson McGuire Terry & Roselius
P.O. Box 138800
Oklahoma City, OK  73113
Telephone: 405-705-3600; Fax: 405-705-2573
jimpriest@whitten-nelson.com
kterry@whitten-nelson.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July 2006, I mailed a true and correct copy of the foregoing document to:

Anthony Allen
417 West Broadway
Muskogee, Oklahoma
918/683-3219 telephone
918/683-3279 facsimile
Attorney for Defendants

*/s/ Kathy D. Terry*